SCOTT J. SAGARIA (BAR # 217981)
sjsagaria@sagarialaw.com
ELLIOT W. GALE (BAR #263326)
egale@sagarialaw.com
JOE B. ANGELO (BAR #268542)
jangelo@sagarialaw.com
SCOTT M. JOHNSON (BAR #287182)
sjohnson@sagarialaw.com
**SAGARIA LAW, P.C.**
3017 Douglas Blvd., Ste. 100
Roseville, CA 95661
408-279-2288 ph
408-279-2299 fax

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| **CATHERINE REYES,** | CASE NO. |
| Plaintiff, | COMPLAINT FOR DAMAGES: |
| v. | 1. Violation of Fair Credit Reporting Act;<br>2. Violation of California Consumer Credit Reporting Agencies Act; |
| Equifax, Inc.; BMW Financial Services, and DOES 1 through 100 inclusive, | |
| Defendants. | |

COMES NOW Plaintiff CATHERINE REYES, an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b)) and the California Consumer Credit Reporting Agencies Act, California Civil Code §1785.25(a). Plaintiff seeks redress for the unlawful and deceptive practices

committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's account with BMW Financial Services.

2. Here Defendant BMW Financial Services is reporting an account as "not more than two payments past due" despite Plaintiff never missing a payment on the account and having the account paid off in December of 2015.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

## JURISDICTION & VENUE

4. Plaintiff re-alleges and incorporates herein by this reference the allegations in each and every paragraph above, fully set forth herein.

5. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

6. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

7. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

8. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

9. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's ability to reorganize and repair Plaintiff's FICO Score.

10. In the alternative Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

**FICO, Inc.**

11. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

12. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

13. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

14. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

15. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

16. There are 28 FICO Scores that are commonly used by lenders.

17. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

18. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

19. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

20. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.

21. Each of the five factors is weighted differently by FICO.

22. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

23. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score.  Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.
24. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.
25. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.
26. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

## Metro 2

27. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.
28. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.
29. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.
30. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.
31. The CDIA is *The* expert on accurate credit reporting. In support of this allegation Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.

    d. The CDIA offers a FCRA awareness program for DFs.

    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.

    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

32. The CDIA's Metro 2 is accepted by all CRAs.
33. The credit reporting accepted industry standards for reporting metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).
34. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
35. The three main credit bureaus helped draft the CRRG.
36. The CRRG is not readily available to the public. It can be purchased online for $229.45.
37. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.
38. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.
39. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.
40. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

### e-OSCAR

41. E-OSCAR is the web based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.
42. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.
43. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

### Plaintiff's Account with BMW Financial Services

44. In 2012 Plaintiff owned a BMW automobile, which was financed through BMW Financial Services.
45. Plaintiff was always on time with the payments on the account and was never late with any payment to BMW Financial Services.
46. In November of 2015 Plaintiff elected to trade in the vehicle that was financed by BMW Financial Services.
47. At the time the vehicle was traded in Plaintiff was current with the payments and had not fallen behind.
48. Plaintiff believes that the loan to BMW Financial Services was paid off in either November or December of 2015.
49. On January 20, 2017 Plaintiff ordered a three bureau credit report from Experian Information Solutions, Inc.; Equifax, Inc. and TransUnion, LLC to ensure proper reporting by BMW Financial Services.
50. Plaintiff noticed the BMW Financial Services trade line on the January 20, 2017 credit report contained some information that seemed inaccurate given the history of the loan and that it was paid off nearly a year prior.  Specifically, BMW continued to report the account status as 30 days late despite the debt having been satisfied.
51. In response, Plaintiff disputed the BMW trade lines via certified mail with Experian Information Solutions, Inc.; Equifax, Inc.; and TransUnion, LLC on January 31, 2017.
52. Plaintiff's dispute letter specifically put defendant BMW on notice that Plaintiff was disputing the late payment, past-due, and balance notations on the credit report. .

53. Plaintiff also requested the account be marked disputed if the investigation disagreed with Plaintiff's assertions.
54. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to each DF via an ACDV through e-OSCAR.
55. On March 20, 2017 after the statutory time period had elapsed for Plaintiff to receive a reinvestigation report from the credit Bureaus, Plaintiff ordered a second three bureau credit report from Experian Information Solutions, Inc.; Equifax, Inc. and TransUnion, LLC for the sole purpose to ensure Plaintiff's accounts had in fact been updated.

**Inaccuracy – BMW**

56. Plaintiff was frustrated to see that Defendant BMW did not properly update the account but instead was reporting Plaintiff's account, beginning in 100135xxxx, as "not more than two payments past due" despite having paid off the account in full in 2015.
57. The payment status on Plaintiff's credit report is incorrect and misleading as Plaintiff was never more than two payments behind on the account and, in fact, the account was paid off in full without Plaintiff ever missing a payment.
58. BMW Financial Service's reporting implies that Plaintiff did miss payments on the account, which is not true.

**Damages**

59. Here, Plaintiff pulled the credit report at issue at a cost of $39.95, specifically for the sole purpose of verifying that the inaccuracies were fixed.
60. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, emotional harm, and excessive stress resulting in a lower credit score.
61. The actions of Equifax, Inc. and BMW as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).
62. The actions of BMW as alleged herein are acts in violation of the Consumer Credit Reporting Agencies Act California Civil Code § 1785.25(a).

**FIRST CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants and Does 1-100)

**Equifax, Inc. – Failure to Assure Credit Reporting Accuracy.**

63. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

64. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.

65. Had Equifax maintained reasonable procedures to assure maximum accuracy Experian would never have allowed Defendant BMW to report the account as described herein.

66. As a result of Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**Willfulness**

67. The violations described herein by Equifax were willful, specifically the Credit Bureaus including defendant Equifax have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

68. Equifax intentionally sends consumer disputes to employees who do not live within the continental United States.

69. This is intentionally done to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.

70. These employees for Defendant Equifax receive little to know training concerning how to accurately report consumer debt.

71. Instead these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F.Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols*., Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols*., No. CV 14-05276-AB (ASX)

72. Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

73. Equifax has intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

74. Equifax also allowed BMW to report the account incorrectly as Plaintiff paid off the account in 2015.
75. Given that Equifax helped draft the CRRG, and Plaintiff specifically referenced industry guidelines in the dispute letter Equifax knew that these accounts were not reporting in a manner consistent with industry standards i.e. accurate, but chose to do nothing.
76. Consequently, Defendant Equifax is liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Equifax was at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.
77. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**SECOND CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendants and Does 1-100)

**BMW Financial Services –Failure to Reinvestigate.**

78. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.
79. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.
80. Defendant BMW violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.
81. The CRAs provided notice to BMW that Plaintiff was disputing the inaccurate and misleading information but BMW  failed to conduct a reasonable investigation of the information as required by the FCRA.
82. Based on Plaintiff's dispute, BMW should have known its account was paid off.
83. The most basic investigation would include a simple review of well-established credit reporting industry standards.

84. Plaintiff alleges BMW did not review well established industry standards for credit reporting.
85. If BMW had reviewed such standards BMW would have seen its reporting was not in compliance and consequently inaccurate and or incomplete.
86. Such an investigation would be reasonable.
87. Plaintiff also alleges that BMW did not investigate whether the account as paid in November/December of 2015.
88. The lack of investigation is unreasonable.
89. Plaintiff further alleges that BMW has not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures making BMW's violation willful.

**Equifax, Inc. – Failure to Reinvestigate Disputed Information.**

90. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.
91. After Plaintiff disputed the accounts mentioned above, Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.
92. Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.
93. Plaintiff alleges that Equifax has its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.
94. Equifax is not a passive entity bound to report whatever information a DF provides.
95. Plaintiff alleges that Equifax is readily familiar with Metro 2 guidelines and credit reporting industry standards given that Equifax helped draft said guidelines.
96. Given the aforementioned, Plaintiff alleges that Equifax can and does suppress inaccurate information from being reported when DFs provide inaccurate information.
97. Equifax can and does instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

98. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that certain DFs were not following credit reporting industry standards.
99. Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.
100. Equifax intentionally, willfully or with reckless disregard for Plaintiff's accuracy did no investigation whatsoever given that Equifax general policy is to simply parrot whatever information a data furnishers sends.
101. Such policy and procedure inherently leads to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

### THIRD CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants and Does 1-100)

**Equifax, Inc. – Failure to Review and Consider All Relevant Information.**

102. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.
103. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.
104. As a result of Equifax violation of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to , damage to reputation, embarrassment, humiliation, and other mental and emotional distress.
105. The violations by Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.
106. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.
107. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendants and Does 1-100)

**Equifax, Inc. – Failure to Delete Disputed and Inaccurate Information.**

108. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

109. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

110. As a result of Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

111. The violations by Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

112. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

113. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FIFTH CAUSE OF ACTION**
(Violation of California Consumer Credit Reporting Agencies Act
California Civil Code § 1785.25(a) Against Defendants and Does 1-100)

**BMW – Reporting Inaccurate Information to Equifax, Inc.**

114. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

115. In the regular course of its business operations, BMW routinely furnish information to credit reporting agencies pertaining to transactions between Defendants and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

116. BMW intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not comply with well-established industry standards in an intentional attempt to have Plaintiff pay on a debt that was previously paid in full.

117. Plaintiff alleges that BMW re-reported the information contained herein in violation of California Civil Code § 1785.25(a).
118. Plaintiff also alleges that BMW had reason to know that the information reported on Plaintiff's account was misleading, inaccurate, incomplete, and did not comply with well-established credit reporting industry standards.
119. Plaintiff alleges that BMW had reason to know that by not following well-established industry standards lenders will draw a more negative inference with respect to Plaintiff's credit worthiness.
120. Plaintiff alleges that the dispute that was sent regarding the account should have alerted BMW that the account was paid off..
121. BMW failed to notify Equifax, Inc. that the information Defendant re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).
122. BMW's communications of false information, and repeated failures to investigate, and correct their inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Plaintiff's rights.
123. As a direct and proximate result of BMW's willful and untrue communications, Plaintiff has suffered actual damages including but not limited to reviewing credit reports from all three consumer reporting agencies, time reviewing reports with counsel, sending demand letters, diminished credit score, emotional distress, frustration, and such further expenses in an amount to be determined at trial. Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;
3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31
4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. §

1681n & o; California Civil Code § 1785.31;

5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Dated: September 18, 2017

**SAGARIA LAW, P.C.**
*/s/ Elliot Gale, Esq.*
Scott Sagaria, Esq.
Elliot Gale, Esq.
Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

Dated: September 18, 2017

**SAGARIA LAW, P.C.**
*/s/ Elliot Gale, Esq.*
Scott Sagaria, Esq.
Elliot Gale, Esq.
Attorneys for Plaintiff